HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>SUNG HONG aka LAURENCE HONG aka LAWRENCE HONG and HYUN JOO HONG aka GRACE HONG,<br><br>                              Defendants. | **Case No. CR-17-163TSZ**<br><br>**DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM**<br><br>**Sentencing:  October 11, 2018 at 9:30 a.m.** |

## I.    INTRODUCTION

Defendant Sung ("Lawrence") Hong pled guilty under a plea agreement to three counts. Count 1 is conspiracy to commit wire fraud in violation of Title 18 U.S.C. § 1349.  Count 2 is conspiracy to launder monetary instruments in violation of Title 18 U.S.C. § 1956.  Count 3 is false statement in violation of Title 18 U.S.C. § 1001.  The government is represented by Assistant U.S. Attorneys Justin Arnold and Steve Masada.  The defendant is represented by C. James Frush.  The presentence report was prepared by Steve McNickle and finalized by Kalen Thomas.

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 1
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

The defendant's wife, Hyun Joo ("Grace") Hong, is a co-defendant.  Pursuant to her plea agreement, she pled guilty to conspiracy to commit wire fraud and wire fraud.  Her sentencing is set for the same time and place.  It is counsel's understanding that common issues of fact and law and any evidentiary aspect of the sentencing will be joint but that the particular sentencing of each defendant after the determination of the applicable facts and law will be separate, but both on the same date.

The government recommends a sentence of 24 years and 4 months (292 months).  Probation recommends a sentence of 12 years (144 months).  The defense recommends a sentence between 8 and 10 years (96 to 120 months) as "sufficient, but not greater than necessary, to satisfy the purposes of sentencing."  18 U.S.C. § 3553(a).

## II.     THE DEFENDANT

The defendant is a 47 year old Korean American male, with a prior conviction in this district for mail fraud in 2007 for which he received a sentence of 33 months from the Honorable James L. Robart.

The defendant's childhood, upbringing, and motivations are somewhat of an enigma.  Perhaps the key to understanding these matters is intergration of his mother's letter in support into the "facts" as presented in the presentence report ("PSR") and elsewhere.

The PSR is contradictory as to whether Lawrence was exposed to mental and physical abuse.  Paragraph 46 notes that Lawrence's father was a "traditional Korean father" in his discipline and inability to show affection.  The PSR notes that the father never talked about his feelings, never told the defendant that he loved him, and was a strict disciplinarian.  The PSR notes that Lawrence recalls being hit as punishment but states that Lawrence did not characterize

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 2
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   that behavior as abuse. That contradiction is difficult to resolve. The PSR also notes that the

2   defendant denied ever being exposed to any mental, physical, or sexual abuse.

3       The letter submitted by Lawrence's mother, Hyo Soon Hong, presents a more detailed

4   and less contradictory portrait. For the Court's convenience, that letter is attached to this

5   memorandum. Mrs. Hong admits that Lawrence was raised the way she was raised and was

6   abused daily. She notes that she would beat him with a poker she used to tend the coal stove,

7   told him terrible things, and told him "he was worthless and a dog." She also notes that her

8   husband physically abused both of them daily, punching and kicking them, consistent with the

9   PSR indicating that Lawrence said he saw his father physically abuse his mother at times.

10      Mrs. Hong's letter indicates that this physical and mental abuse continued throughout

11  Lawrence's upbringing and through high school. Mrs. Hong has also made statements in her

12  letter and to counsel which, somewhat contradictory to statements in the PSR, indicate that the

13  "marriage" with her husband was not a close one and that the husband may have resented the

14  fact that Lawrence was not their biological child. In her letter, Mrs. Hong has also indicated that

15  the marriage was more in form and not one of substance. Mrs. Hong also reveals for the first

16  time to her son that he was a foundling and was left on her doorstep.

17      The PSR, paragraph 47, states that after immigration to the United States in about 1980

18  his "father worked and his mother stayed home with him." The understanding given to counsel

19  by Mrs. Hong is that the father was significantly absent from the family and she supported

20  Lawrence and herself in a grocery business. Apparently, the mother's businesses which

21  sustained Lawrence and her were not participated in by the father. Mrs. Hong's letter indicates

22  that she bought a small grocery market with borrowed money. As a consequence, as Mrs. Hong

23  notes,

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 3
[CASE NO. CR-17-00163TSZ]

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

> "Lawrence was not able to play with any other children because he worked whenever he was not at school. He would tag items, keep inventory, and work at the front desk, because he spoke more English than me."

2

3      As noted in the PSR and confirmed by Mrs. Hong, Lawrence's father will have nothing

4   to do with him or Lawrence's family (wife Grace and three children) because of the earlier fraud

5   conviction.  Counsel has also noted the lack of evidence of any interaction between Lawrence

6   and his father prior to that time.

7      The PSR and Mrs. Hong's letter indicate that the grocery store was sold in about 1987

8   and she began making her living in the motel business.  PSR ¶ 45, Mrs. Hong's letter.  At this

9   point, Lawrence was about 15 years old.  As Mrs. Hong relates:

10

> "Eventually, I sold the grocery store and bought a motel. Even in high school and middle school, Lawrence worked till 4 in the morning working the front desk of the motel. Most of my clients were drug-addicts and hookers, and when they had no food, Lawrence would make them rice and kimchi."

11

12

13      As noted in the PSR, paragraph 62, the defendant from 1987 through 1999 helped his

14   mother run the motel and worked in "every aspect of this business," not being paid a salary.  In

15   approximately 2000, Mrs. Hong sold the motel and retired.  PSR ¶ 45.  Lawrence started an

16   investment company called H&H Group Inc.  PSR ¶ 61.  While his mother was ostensibly

17   connected to the business, she did not participate in it.  As the PSR notes, Lawrence traded

18   stocks and commodities, but after the stock market crashed following the 9/11 attacks in 2001,

19   he made very little money.  Lawrence had always been fascinated by the stock market but left

20   Seattle University while studying finance after a couple of years.  H&H investments, ostensibly

21   standing for Hong and Hong, his mother and himself, was a failure.

22      Throughout his life, Lawrence has been pressured to succeed financially and escape the

23   poverty his parents endured.  As Mrs. Hong states:

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 4
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

"I raised Lawrence to do whatever it took to make money and pressured him to succeed. I had grown up in war time, so I always told Lawrence how much I had been through to get him to America. I think Lawrence remembers this and remembers how poor we were and how we barely survived. I nagged him constantly to make more money and to provide for me. When he started making money, I finally told him I was proud of him and loved him."

Reading the PSR in light of Mrs. Hong's letter, a strong case is made that Lawrence suffered significant physical and psychological abuse throughout his entire childhood, which probably, on the psychological side, continued into his young adulthood.

Certainly, Lawrence's choices to repeatedly engage in fraudulent behavior relating to the investment of others in the stock market were conscious, voluntary, and deliberate acts. However, when viewed against and in light of his upbringing and his "home" experiences, the origins of this criminal behavior are not so difficult to discern, that is significant physical, mental, and emotional abuse inflicted upon him by not only his parents' colored world view of constant toil and exposure to poverty, but also by the customers of the grocery and the clients at the motel. As 18 U.S.C. § 3553(a)(1) instructs the Court, the "characteristics of the defendant" are a factor to be weighed in determining an appropriate sentence.

PSR paragraph 49 mentions issues the defendant experiences with gambling in casinos which were reflected in the last PSR. The reality is that anyone looking at what Lawrence has done in the last seven years clearly indicates that whether in a casino or in the stock market, particularly trading futures, Lawrence continues to have a gambling problem. Unfortunately, he is not a good gambler, but has lost his money for both himself and others.

Lawrence and his wife Grace have three children, ages 2, 4 and 6. The two older children have been able to visit Lawrence, usually twice a month in the company of his mother. His wife Grace is not permitted to visit Lawrence because she has electronic monitoring. Grace and the children are currently living with Lawrence's mother. If Grace is imprisoned, Lawrence's

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 5
[CASE NO. CR-17-00163TSZ]

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

mother is incapable of raising them and they must be sent to Korea. At this time, efforts to place the children in Korea, even separately, have been unsuccessful.

Lawrence was arrested on or about June 1, 2017 and has been detained at FDC SeaTac since that time. When arrested, he confessed.

### III.    THE OFFENSE CONDUCT

While the defense agrees that there is a $12 million loss, it ought to be noted that these monies were not all obtained in the same way. The bulk of the loss, from Dr. A. (c.$4,000,000) and A.C.1 (c.$3,000,000), in an amount equaling approximately $7,000,000, were obtained from them with their knowledge of Lawrence's criminal background, and his inability to obtain a securities license, and were made partly as investors in the Pishon businesses rather than providing the funds to Lawrence for management and investment. Both of these investments were also converted to loans, not due until dates after Lawrence's arrest.

A second group of victims are those who were obtained as a result of the appearance of the Hong's at the Lancaster, California prophetic conference in August, 2016. These are the individuals who provided monies that were placed in "Separately Managed Accounts" or SMAs, and total approximately $3,000,000. It is important to note that the Hongs did not have access to these funds. The Hongs only exercised control for investment. The contract between the Hongs and the investors provided that the Hongs would only be compensated based on a positive performance, not, as is usual, paid a percentage of assets under investment. While many, if not most, of these individuals sustained losses in the end, it was a function of Lawrence's poor trading abilities rather than any conversion or theft. We do not dispute the fact that the monies would not have been entrusted to the Hong's management without the false statements that were made at the conference (during which there were no actual solicitations).

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 6
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

A third group of victims are those people recruited by A.C.2, or the Primoris investors. These people were all from Korea and Lawrence had little if any contact directly with any of them. These victims accounted for approximately $750,000 of the loss amount.

Lastly, there are direct investors, some of whom started out with SMAs, such as P.N., or just simply provided money directly to Lawrence to manage, such as M.S. This group accounts for approximately $2,000,000.

These four different groups of victims reveal different levels of culpability. In our opinion, Lawrence is most culpable for the direct investors, less culpable for the Primoris group who he did not solicit directly and who were brought to him by A.C.2, much less culpable for Dr. A. and A.C.1, sophisticated investors who turned their investments into loans, and least culpable for the SMAs (where no funds were ever converted, only lost by trading), generally without significant losses for each individual. As noted in the Declaration of Frank Miller filed herewith ("Miller Declaration"), immediately before the 2016 presidential election, as of October 31, 2016, the SMA accounts all had significant profits. It is also worth noting that of the 39 investors, 5 lost nothing and actually profited. Id.

It is true that the Hongs used misappropriated funds to pay personal expenses and to maintain a successful lifestyle. However, at times Lawrence actually made significant amounts of money for both the investors and himself, some of which helped support the personal expenses a successful lifestyle the government emphasizes. Miller Declaration. Furthermore, the Hongs providing investors with materially false information about the performance of their investments is simply not true as to all of the investors. The SMAs were available for daily review by the owners of the accounts and, as noted above, the Hongs were only compensated if the investments made money. Furthermore, we are unaware of any widespread false

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 7
[CASE NO. CR-17-00163TSZ]

1   documentation reflecting fictitious returns or otherwise as we so commonly see in these cases.

2   The real fraud was not so much in the management of the funds for the most part (with some

3   exceptions, including that of P.N.), but more a function of the false statements relating to

4   Lawrence and Grace's backgrounds and experiences, particularly that Lawrence supposedly

5   managed large sums of money for Korean families in Korea.  These false representations, as

6   noted in the plea agreement, caused people to provide access to their funds to the Hongs.  Again,

7   as noted, the Hongs had no ability to take any funds out of the SMAs.

8          This was not a monolithic fraud that we usually see in these cases.  This was not a "Ponzi

9   scheme" where new investments are used to pay returns on earlier investments.  This was

10  primarily a situation where funds were obtained through false representations.  Some of those

11  funds were diverted for the Hongs personal use and to maintain their lifestyle, that is true.

12  However, some of the funds were obtained as investments in the Pishon entities such as from Dr.

13  A. and A.C.1, both of which turned their investments into promissory notes at a later date.

14  Ultimately, if Lawrence had not bet wrong on the results of the 2016 presidential election and

15  taken a position in the market with the SMAs that resulted in significant losses in those accounts,

16  the SMA investors would not have complained.  At times, Lawrence made significant monies for

17  some of the investors, including Pastor S. whose church entrusted funds to him.  Miller

18  Declaration.  Ultimately, the church may have lost money but at certain times it was far ahead.

19  Id.  More than a few actually ended with a profit in their SMA.  Id.  We are not attempting to

20  minimize the behavior as there were certain investors whose funds were clearly misappropriated

21  and used for personal expenses, some of it for travel, such as P.N.'s monies.  However, again,

22  this was not a monolithic fraud or a Ponzi scheme.  It was a situation where false statements and

23  representations (sometimes by others such as A.C.2, not Lawrence) were made to induce the

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 8
[CASE NO. CR-17-00163TSZ]

1  differently situated and differently sophisticated investors to allow Lawrence to manage

2  investment of their funds (or, in some instances, convert them to his own use) and those

3  investments were ultimately poor ones.

4         As noted, frequently Lawrence was a successful investor.  Miller Declaration.  This

5  success provided him a false sense of investing acumen and probably ultimately worked against

6  him.  Again, this is more a case about Lawrence's poor investing skills coupled with his false

7  representations to obtain funds than any kind of Ponzi scheme or conversion and diversion of

8  funds.  Yes, conversion and diversion did occur, but not on the scale of $12 million.

9         Lastly, some of the property being forfeited was not the result of the fraudulent scheme

10  but had been acquired either independent of it or prior to it.  Furthermore, at various times

11  Lawrence made money, both trading for his own account and by receiving a percentage of the

12  profits pursuant to contracts with the SMA individuals.  Miller Declaration.  Some of these items

13  were purchased with those funds.

14         The only religious "group" that the Hongs appeared before was a "Prophetic conference"

15  in Lancaster, California in August, 2016.  This was not a neighborhood church or mainstream

16  group, or an organized group at all.  These prophetic ministers are a fringe evangelical

17  movement, led by such as Pastor S., who believe that God speaks through them and that they

18  have the gift of prophecy.  This is hardly a normal or legitimate church congregation.  These

19  were not people who knew Lawrence or Grace, they did not attend church with them, and they

20  were simply introduced by Pastor S. to the Hongs at this conference where it was primarily

21  Pastor S. who talked about the Hongs' prowess in investing money.  He repeatedly pointed out to

22  the attendees that Lawrence had made money for his "church."  At that time, that was true.

23  Again, the false representations related to obtaining the investments.  In addition, all of these

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 9
[CASE NO. CR-17-00163TSZ]

investments from the prophetic conference were in the SMAs where the Hongs could not misappropriate the investments, but rather, Lawrence could simply lose them by poor investment decisions.

In addition, it is important to note that the church investment funds from Pastor S.'s "church" and the SMAs created for those who attended the prophetic conference made money up until the 2016 elections when Lawrence guessed wrong as to who would win.  Miller Declaration.  As we all know, Lawrence is not the only person who called the outcome of the 2016 election in error.

In addition, while the Hongs, both religious people, tended to obtain investments from those with similar religious beliefs, the Hongs did not target or pretend to represent religious organizations.  While the Hongs no doubt worked with investors who shared religious beliefs, there was no representation of any religious organizations.  The prophetic conference in Lancaster, California cannot be called a "religious organization" but was more like a rally or show.  In addition, the Hongs were very active in supporting religious outreach and did in fact donate significant sums for those purposes and visited Haiti for relief work.  Grace's tax returns reflect significant charitable contributions made by the Hongs.  Miller Declaration.  Lastly, the Pishon Foundation was not part of the scheme.  While there was a Pishon Foundation created, it was not active.  In fact, the monies that were given by the Hongs to religious outreach activities were not funneled through the Pishon Foundation.

PSR paragraph 43 reflects a discussion of the Pishon entities.  Pishon Holding LLC was the heart of the fraud.  There were other companies that used the Pishon name but none of these were active in the fraud.  The Foundation was inactive.  Pishon & Company LLC was Lawrence's personal trading account and not used in the fraud.  The First Pishon LLC was

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    inactive and the Pishon Holding LLC replaced it when the Hongs were told by people that it was

2    confusing.  Pishon Capital Management LLC was the business in which the monies were

3    invested by A.C.1 and Dr. A. and subsequently turned into loans by those men.

4        The Hongs' lifestyle also needs to be put in context.  After Lawrence and Grace left

5    Lawrence's mothers house where they resided when they were initially married, they rented a

6    house in the Cougar Mountain area for approximately $6,000 a month.  There was also an

7    additional rental in the Bellevue area at well less than $12,000 before they rented the Clyde Hill

8    house.

9        As for the automobiles, Lawrence has always had a strong interest in cars.  However, two

10   of the cars that were purchased were used cars and one of them was leased.  Furthermore, they

11   were not all possessed at the same time.  The Lamborghini was acquired in 2013, and as we

12   understand it, was traded in for the Maserati in 2015.  The Aston Martin had been purchased in

13   May, 2017, days before the arrests.  It should be appreciated by this point the Hongs had

14   promissory notes to Dr. A. and A.C.1 for millions of dollars, and as far as the relationship

15   between those parties was concerned, there was no reason the Hongs could not do with the

16   money provided as loans as they wished.  Payments due Dr. A. were not to begin until June

17   2017, at a time after the Hongs had been arrested.  Lastly, the "yacht" was a 40-foot boat that

18   was purchased by Dr. A. for the Hongs' use and on which Dr. A. has stated that he did not lose

19   any money.  It had been sold by the time the Hongs were arrested.

20       Generally, based on false representations, people entrusted the Hongs to manage their

21   SMAs.  It is true that some victims, such as P.N., did withdraw the money from the SMA and

22   give it directly to the Hongs, but this was very atypical for the SMA accounts.

23

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 11
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN** LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## IV.    CRIMINAL HISTORY CALCULATION

Lawrence only has one previous conviction, that is, for the wire fraud for which he received 33 months in jail from Judge Robart, but a quite high Criminal History Category of III. There are 3 points for the fraud conviction under USSG § 4A1.1(a) for a sentence of imprisonment exceeding one year and one month.  Under USSG § 4A1.1(d), 2 points are added because Lawrence committed a part of the instant offense while on supervised release from the earlier fraud conviction.  A Criminal History score of 5 establishes a Criminal History Category of III, which adds a significant number of months to the guideline range.  The ultimate result is to treat Lawrence in the same fashion as a three-time loser or someone with multiple prior convictions.

## V.    GUIDELINE CALCULATION

As noted below, Lawrence and the government agree on all guideline calculations except for the 4 level enhancement under USSG § 2B1.1(b)(19)(A)(B) if the defendant is an "investment advisor" and/or a "commodities trading advisor," and the 2 level enhancement under § 2B1.1(b)(9)(A) and (C) if the defendant misrepresented that he was acting on behalf of a charitable or religious organization.

We currently agree with the 4 levels added for substantial hardship to five plus investors under § 2B1.1(b)(2)(B).  We believe the number of people qualifying for this treatment are not more than five and include (1) P.N., (2) M.S., (3) A.S., (4) C.E., and (5) K.Y., and no others.  In addition, as discussed more fully below, if Lawrence had not pled guilty to the continuing crime of conspiracy, this 2016 adjustment to the guidelines would not apply under ex post factos clause of our Constitution.

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 12
[CASE NO. CR-17-00163TSZ]

1

**A.     Adjustment under § 2B1.1(b)(19)**

2      While trading S&P futures might theoretically be trading in commodities, the adjustment

3  under § 2B1.1(b)(19) should not apply.  That adjustment says that not only must there be a

4  violation of commodities law, at the time of the offense, the defendant must be either (a) an

5  officer or a director of a futures commission merchant or an introducing broker, (b) a

6  commodities trading advisor or (3) a commodity pool operator.  Lawrence was none of these.

7  See also, part (A) of the adjustment where it refers to violations of the securities law where the

8  defendant needs to be licensed or a director or officer of a publicly traded company.  Lawrence

9  was never licensed.  This adjustment is not intended to reach an unlicensed person who happened

10 to pick a future to trade instead of an equity or mutual fund.  Anyone can go on Charles Schwab

11 tomorrow and trade futures, including S&P futures.  That activity doesn't make one subject to

12 this adjustment.

13     *Stinson v. United States*, 508 U.S. 36 (1993) concerns the "binding" effect or lack of

14 same for commentary in the sentencings guidelines, and it appears still to be good law.  If the

15 guideline and the commentary are inconsistent, the guideline controls.  Id.; see also USSG §

16 1.B1.7.  In USSG § 2.B1.1(b)(19)(B), the application notes incorporation of the Commodity

17 Exchange Act's definitions is inconsistent with the guideline as use of the definition in the Act

18 renders the use of the word "and" in the guideline superfluous.  It is the clear intent of the

19 guideline to enhance the punishment for someone who violates a commodities law and who has

20 some type of license.

21     This adjustment is a 2016 guideline amendment.  The language from Amendment 653 in

22 Appendix C of Volume II at page 838 states:

23

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 13
[CASE NO. CR-17-00163TSZ]

"The amendment expands the scope of this enhancement to cover registered brokers and dealers, associated persons of a broker or dealer, investment advisers, and associated persons of an investment adviser. The amendment also expands the scope of the enhancement to apply if the offense involves a violation of commodities law and, at the time of the offense, the defendant was an officer or director of a futures commission merchant or introducing broker, a commodities trading advisor, or a commodity pool operator. The Commission concluded that a four level enhancement appropriately reflects the culpability of offenders who occupy such positions and who are subject to heightened fiduciary duties imposed by securities law or commodities law similar to duties imposed on officers and directors of publicly traded corporations."

This language from "the horse's mouth" should put this dispute to rest.

**B.**     **Adjustment under § 2B1.1(b)(9)**

Section 2B1.1(b)(9) provides a 2 level increase if the offense involved (a) "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency."  The key words here are that "the defendant was acting on behalf of . . . an organization."

Application Note 8(B) discusses "misrepresentations regarding charitable and other institutions."  Again here, the operative word is "institutions."  The three examples cited in 8(B) involve solicitation for a non-existent famine release organization, fundraising for a religiously affiliated school, and the chief of a local fire department soliciting money for a new fire engine for the department when he intended to divert the funds.

Lawrence never made "a misrepresentation that he was acting on behalf of a charitable or religious organization," under § 2B1.1(b)(9).  The language "acting on behalf of an organization" is critical.  Fraudsters may prey on their fellow church members or those with similar belief structures, but the misrepresentation under the enhancement must be that the person is acting on behalf of an organization.  While Lawrence took money from a prophetic church, he didn't take money from others that he represented would be going to that church.  The investors were in it

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   for themselves, which might have put them in a better position to embrace the glory of God, but

2   that's not enough.

3        An important prong of this analysis is that the funds solicited from the investors are

4   benefiting a particular institution, organization or entity.  There is no evidence whatsoever that

5   Lawrence represented that he represented a particular charity, institution, or entity.  It was

6   always part of Lawrence's solicitation that any funds invested were invested for the benefit of

7   the investor, not for an organization or institution.  While Lawrence held strong religious beliefs,

8   and associated with and victimized those with similar strong religious beliefs, the solicitations

9   were not on behalf of an organization or institution.  The solicitations were for investments that

10  would only benefit the investor with Lawrence being compensated with a percentage of any

11  profit made.

12       It is anticipated the government will cite *U.S. v. Treadwell,* 553 Fed. 3d 990 (9th Cir.

13  2010) for the proposition that this adjustment should apply.  However, a full reading of

14  *Treadwell* confirms that this adjustment does not apply.  The facts in *Treadwell* are easily

15  distinguishable as misrepresentations were made that a portion of the proceeds would be used for

16  humanitarian purposes with an inference that a charitable organization was involved.  *Supra,*

17  1005-1008.  *Treadwell* appropriately points out the rules of statutory construction: "if the text of

18  a guideline is unambiguous, its plain meaning controls."  *Supra* at 1006.  The cases cited from

19  other circuits within *Treadwell* all deal with institutions or organizations, including (1) a church,

20  (2) an Indian tribes' education department, (3) the American Cancer Society, (4) United Way, (5)

21  a "New Concept in Philanthropy Program," and (6) a non-profit corporation.  *Supra* at 1007.

22  The *Treadwell* defendants specifically stated that "some of the programs that we are involved in,

23  a certain percentage of the returns that we do . . . gain from those projects, do have to be returned

24

1  into humanitarian needs . . ." and went on to talk about seeing the benefits, "to see people that

2  are hungry," and more.  *Supra* at 1005.  The *Treadwell* court concluded that "these statements

3  were intended to lead victims to infer involvement of a 'charitable organization,'" *supra* at 1008.

4  In sum, the unambiguous language of the adjustment, the application note, and the particular

5  facts of *Treadwell* do not support this adjustment for Lawrence.

6          In summary, defendant's guideline calculation is:

7              Base offense level:                    7

8              Loss amount:                          20

9              Money laundering count:               2

10             Substantial hardship to five victims:  4

11             Sophisticated means:                  _____2_

12             Sub-Total:                            35
              Acceptance of responsibility:      ____(3)_

13

14             **TOTAL:**                           **32**

15         A guideline calculation of 32 with Criminal History III results in a range of 151 to 188

   months.

16

17              **VI.     APPLICATION OF FACTORS UNDER 18 U.S.C. § 3553**

18         18 U.S.C. § 3553 directs this Court to consider certain factors in imposing a sentence.

19  Subsection (a)(1) indicates that the "nature and circumstances of the offense" are one factor.  As

20  noted above, this was not a monolithic fraud, it was not a Ponzi scheme, and over half the loss

21  amount came from two sophisticated business people who began as business partners more than

22  investors with the Hongs and ultimately turned their "investment" into a promissory note.  While

23  there were direct diversion of a few investors' funds to support an expensive residence and one

24  upscale vacation, most of the losses suffered by the vast bulk of investors were due to the poor

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 16
[CASE NO. CR-17-00163TSZ]

1   trading skills of Lawrence, not diversion.  The Hongs in good faith believed that their efforts

2   would ultimately establish a legitimate hedge fund that would produce a good return.  Lawrence

3   did at times produce a good return for investors, and this fact differentiates this fraud from the

4   type in which there is absolutely no efforts directed towards attempting to legitimatize a business

5   or make any return to investors.  The government attempts to portray this as "the crime of the

6   century" and, without understating the harm caused to particular investors, in size and scope this

7   was rather a middling if not lower level fraud in proportion to others in this district and

8   elsewhere.  There are victims who have substantial hardship because they believed the false

9   statements made by Lawrence and trusted him, but, as compared to many cases, they are

10  relatively few in number, and did not involve shareholders or a corporation's suppliers as

11  victims.

12          Subsection (a)(1) of § 3553 also points out that the "characteristics of the defendant" are

13  another factor to be considered.  An earlier portion of this memorandum described in detail the

14  physical and psychological abuse that Lawrence experienced throughout his upbringing and into

15  young adulthood.  In addition, Lawrence turned 47 years old this September and is the loving

16  father of three children under the age of 6.  A sentence of 8 to 10 years will give him the last

17  clear chance to return to his family in his mid to late 50s, to be a father, perhaps a husband, and

18  establish a legitimate approach to life and production of an income that will allow him to support

19  his family, himself, and pay restitution, another factor to be considered under § 3553(a)(7).

20          An 8 to 10 year sentence certainly reflects the seriousness of the offense, promotes

21  respect for the law, and provides for just punishment, serving as an adequate deterrent both to the

22  public and to this particular defendant.

23

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 17
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   Lastly, and most importantly, is § 3553(a)(6) which directs this Court to consider "the

2   need to avoid unwarranted sentence disparities among defendants with similar records who have

3   been found guilty of similar conduct."

4   As Probation notes, downward variance may be appropriate to avoid sentencing disparity

5   when compared to other defendants sentenced for similar crimes.  In this district, Darren Berg

6   was sentenced to 18 years in prison for defrauding hundreds of investors (approximately 500?) of

7   more than $100 million for an investment Ponzi scheme he ran for nearly a decade.  Judge Jones

8   noted in that sentencing that previously, in a $90 million Ponzi scheme, considered Washington

9   State's largest fraud until then, the defendant received a 20 year sentence.

10  Parallels to Berg are compelling in Lawrence's case.  Both had a prior federal conviction

11  for fraud with Berg's from the District of Oregon while Lawrence was convicted in this District.

12  It should be noted that Lawrence confessed when he was arrested and has not obstructed these

13  proceedings in any fashion.  Berg secreted funds during the process and was not truly

14  forthcoming.

15  The Probation Department has discussed Berg and other similar situated defendants.  The

16  bulk of the $12 million claimed as the loss amount here came from two individuals, both of

17  whom were aware of the criminal history of Lawrence and were basically investment partners

18  with Lawrence who eventually turned their investments into loans.  If you subtract those two

19  victims out, both of whom were sophisticated and both of whom did not have their lifestyles

20  materially altered by involvement with Lawrence, you are left with less than three dozen victims

21  (counting couples as one victim) who lost approximately $5 million, primarily through poor

22  choices made by Lawrence's investment strategy, probably accounting for about $3 million.

23

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 18
[CASE NO. CR-17-00163TSZ]

## VII.    GOVERNMENT MANIPULATION AND OVER CALCULATION OF GUIDELINE SCORES

In addition to the disparity issues, there are also significant issues regarding the over counting and over calculation of guideline points in white collar cases.  At one point, Lawrence attempted to plead "straight up" to the original indictment in this matter without any plea agreement.  While attempting to do so, the government superseded its indictment in a fashion which significantly affected the guideline calculation.

First, the superseding indictment added a money laundering count which added 2 points to the guideline calculation.  It is impossible to think of a fraud case which would not present a factual predicate for including a money laundering count.  That count was not included in the original indictment.  By inserting it into the superseding indictment and forcing the defendant to plead guilty to it, an additional 2 points have been added to the guideline score.

Second, there was no conspiracy count in the original indictment.  The government insisted on a plea to a conspiracy count which it included in the superseding indictment.  If it were not the continuing nature of this crime, the ex post facto clause would prevent the additional 4 points added to the guideline calculations for five victims who suffered a substantial hardship.  Some of the five victims which have been used to support that calculation lost their money before the adoption of the 2016 guideline amendments which added this adjustment.

If Lawrence had pled straight up to the original indictment, he would have received a guideline calculation as follows:  base offense level: 7, loss amount: 20, sophisticated means: 2, with a sub-total of 29.  With minus 3 for acceptance, the total would be 26 which, even with Criminal History Category III, which has a range of 78 to 97 months.

In addition to these charging decisions consciously undertaken by the government is the reality that investment fraud cases "pile on" to an extent disproportionate to the crimes involved.

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 19
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1   *U.S. v. Paris,* 573 F. Supp. 2d 744 (S.D.N.Y. 2008) is one of the many cases which discuss this

2   phenomena and also contains an excellent discussion of the efforts the court and the government

3   (unlike in this case) undertook to deal issues of disparity.

4     *U.S. v. Paris* involved a sentencing before Senior District Judge Block in a securities

5   fraud case.  The defendants, the Paris brothers, were engaged in a rather typical "pump and

6   dump" scheme in the world of penny stock investment.  The defendants were sentenced to a term

7   of incarceration of 60 months in face of an advisory guideline of 360 months to life.  As the court

8   noted "this case represents another example where the guidelines in a securities-fraud

9   prosecution have run so amok that they are patently absurd on their face, … due to the 'kind of

10  piling on' of points for which the guidelines have frequently been criticized," citing *U.S. v.*

11  *Addelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).  *Id.* at 745.  The court noted that the

12  guideline range failed to properly reflect the § 3553(a) considerations.  *Id.* 745-6.  The court also

13  noted that the case before it was "simply not of the same character and magnitude as the

14  securities-fraud prosecutions of those who have been responsible for wrecking unimaginable

15  losses on major corporations and, in particular, on their company's employees and stockholders,

16  many of whom lost their pensions and were financially ruined."  *Id.* at 746.  The court considered

17  the amount of the loss, the number of victims, sophisticated means, officers and directors' status,

18  role in the offense, and obstruction of justice.  The court complimented the government for not

19  seeking a guideline sentence, noting that the higher duty of government lawyers is "to seek

20  justice, and not merely to convict."  *Id.* at 751.  The court specifically noted that "the 'primary

21  purpose' of § 3553(a)(6) – calling for 'the need to avoid unwarranted sentence disparities among

22  defendants with similar records who have been found guilty of similar crimes' was 'to reduce

23  unwarranted sentence disparities nationwide.'"  Citation omitted, *Id.* at 751.  The court examined

24

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 20
[CASE NO. CR-17-00163TSZ]

numerous cases including that of Enron, Worldcom, and other corporate scandals. *Id.* at 754. The court also noted that the sentencing guidelines over the past several years reflected a significant increase in the guideline range for white collar crime. *Id.* The court noted that the Second Circuit Court had recognized that under the guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life in prison. Citation omitted, *Id.* 754. The court stated: "While I acknowledge that the 'Guidelines' reflect Congresses judgment as to the appropriate national policy for such crimes … this does not mean that the sentencing guidelines for white collar crimes should be a black stain on common sense." *Id.* The court also cited Judge Rakoff in *Addelson,* noting that Judge Rakoff appropriately described in this situation "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id.* at 751 citing *Addelson* at 512. The court concluded that ultimately it imposed sentences that were "sufficient, but not greater than necessary, to satisfy the purposes of sentencing." *Id.* at 755 citing § 3553(a)(2).

## VIII.    CONCLUSION

This is a fraud case with significant variations among victims and, for most victims, only involved investment losses, not the direct diversion of funds for the defendants' use and benefit. Some victims were horribly treated, there is no question. However, for some individuals Lawrence actually made money and at times, made money for himself. Instances of direct misappropriation were present but not consistent or prevalent. As noted, the SMAs did not allow Lawrence to take monies from the investors' accounts. When the two largest investors (both sophisticated and knowledgeable about Lawrence's criminal record) are eliminated, the loss amount drops to less than half. Finally, the issues of sentence disparities and the over calculation

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 21
[CASE NO. CR-17-00163TSZ]

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

of guideline adjustments are significant.  A sentence between 8 and 10 years is appropriate to

satisfy the factors contained in 18 U.S.C. § 3553 and should be imposed by this Court.

Respectfully submitted this 28th day of September, 2018.

CORR CRONIN LLP

*s/ C. James Frush*
C. James Frush, WSBA No. 7092
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Telephone: (206) 652-8600
Facsimile: (206) 652-8650
jfrush@corrcronin.com

***Attorneys for Defendant Sung Hong***

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 22
[CASE NO. CR-17-00163TSZ]

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 28, 2018, I electronically filed the foregoing with the Clerk of the Court by the CM/ECF System which will send notification of such filing to those registered to receive electronic notices by email transmission at the email addresses provided.

*s/ Sharon Damon*
Sharon Damon, Legal Assistant
CORR CRONIN LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
sdamon@corrcronin.com

DEFENDANT SUNG HONG'S SENTENCING MEMORANDUM - 23
[CASE NO. CR-17-00163TSZ]

Dear Judge Thomas Zilly,

I was born in 1940 in Seoul, Korea, and lived through Japanese Annexation and the Korean War. I lived through unimaginable poverty. My family was homeless, and to make money I would work for rice and salt farmer to hand sew their harvesting bags.

Korea was not always as wealthy as it is today, and in the 70s, Korea was very poor. One morning I woke up and found a three-day old baby left on my doorstep. I had always wanted a baby and could never have one. I decided to take him as my own. I boiled rice and water and fed it to him and took care of him even though I was so poor. I never told Lawrence this, and to this day he believes I am his biological mother.

Though I love him, I raised him the way I was raised, and abused him daily. I beat him with the poker I would use to tend the coal stove. I told him terrible things and said he was worthless and a dog.  My husband also physically abused both of us daily, punching and kicking us.

When Lawrence was 8, in 1979, I accepted an invitation to come to America. Our first days were very difficult, but a few months after I arrived, I was lent some money and I bought a small grocery market. Lawrence was not able to play with any other children, because he worked whenever he was not at school. He would tag items, keep inventory, and work at the front desk, because he spoke more English than me.

Eventually, I sold the grocery store and bought a motel. Even in high school and middle school, Lawrence worked till 4 in the morning working the front desk of the motel. Most of my clients were drug-addicts and hookers, and when they had no food, Lawrence would make them rice and kimchi.

I raised Lawrence to do whatever it took to make money and pressured him to succeed. I had grown up in war time, so I always told Lawrence how much I had been through to get him to America. I think Lawrence remembers this and remembers how poor we were and how we barely survived. I nagged him constantly to make more money and to provide for me. When he started making money, I finally told him I was proud of him and loved him.

I am 78 and I do not know how much longer I will live. Before I die, I want to see my son and my three grandchildren, now 2, 4, and 6, together again. The oldest saw his father get arrested by the FBI, and he has nightmares about it every night. Lawrence and I had terrible childhoods, and I do not want to see another three children grow up in a worse situation. Lawrence loves his children and will do everything he can to be a good father.

I beg you Judge Zilly to keep this in mind when sentencing.

Sincerely,

Hyo Soon Hong